**United States District Court**
**District of Massachusetts**

**Richard C. White Jr., PRO SE,**
        **Plaintiff,**

v.                                    **Civil Action No. 04-10524 RWZ**

**Trustees of Boston University**
**ET AL., Defendants**

The Plaintiff now moves and files this Motion of Explanation as to why the Plaintiff's complaint is not subject to dismissal on the merits presented in the original complaint. Upon my arrival to the US District Court, I processed to the "PRO-SE" intake window located on the second floor. I spoke with a Susan Jenness, the Courts Pro Se intake clerk. I was given all the necessary advise and paperwork to begin my complaint. I explained to Ms. Jenness my unwillingness in having to even file a complaint against Boston University. In short, I told Ms. Jenness that my complaint is very complex yet so simple. It involved violations of my civil rights in many areas and the form used to file the complaint, (JS 44 rev. 12/88) front page, part V, Nature of suit, allowed me to chose only one area. I choose "Torts" block 320, (assault, libel and slander). In my discussion with Ms. Jenness, I informed her that Torts action, #320 was directly related to my civil rights being violated in the Labor area, mainly, block 720, (labor/management relations) which directly effects block 790, (other labor litigation). Ms. Jenness suggested that perhaps I should consider an attorney in my decision in going forward. I was provided with an available list of attorney referral contact number. We discussed the federal mediation assistance program that is also an option. This option is what I desired most. I commented to Ms. Jenness that I did not have the finances available to file my complaint in three separate areas at a cost of $150.00, per complaint. I spoke of my being a Christian and my strong desire to convey forgiveness and reconciliation upon those that unjustly inflict great harm upon my family and me. The defendants named, employed deceitful means to take away my job as a police officer at Boston University. Eighteen months after my resignation from BU, the named defendant's intentionally devised a plot to effect my employment as a police officer with the Plymouth Police Department. Their attempt at attacking my livelihood with the Plymouth Police Department they did during the Plymouth Police hiring process as well. Boston University officials later reported lies and false reports to the Brookline Police Department. Subsequently, they filed criminal complaints against me. Ms. Jenness offered me advise and to prepare my complaint general. That during the mediation stage and as the case progressed, I would then be able to go into detail over my complaint.

I wished to advise them of conflict of interest concerns and the reporting of false police reports by certain officers employed with University's Police Department. I was employed as a police officer at Boston University for 15 years. I was President of the

Boston University Police Patrolmen's Association, (BUPPA) for ten years, serving briefly as Chief Shop Steward. It was while I acted in these capacities of police officer and Union representative at Boston University that led to Boston University's Police Chief Robert Shea's hatred of me. He promised, one day he would fire me. Chief Shea made that comment to me while we were briefly alone together. Chief Shea, not a stupid man, took advantage of the opportunity knowing there were no witnesses. He went on further and stated that he did not care if I did something wrong or not, because even if I was to grieve it I would be out of a job for a year fighting it. He then laughed at me and told me to get out of his office. Little does Chief Shea know that God was also present. I filed an unfair labor practice over his comment to me. Moreover, I voluntarily dismissed the charges. I did this not wanting to cause him harm and hurt his reputation in going forward. I had to made him understand, by documentation, his threats and intimidation I would not tolerate. This was not the first time he made threatening and intimidating comments to me while acting as Union President. Prove of existence see, (exhibits 1, 2 and 3). Chief Shea had a personal vendetta against me because of my position as Union President in the Unions filing of charges against his son, officer Kevin Shea. It was proven that Anne (Verge) Shea, Kevin Shea and Tony Devlin conspired together in an attempt to grant the detective branch a dollar an hour pay raise during a closed contract negotiations session.

I firmly believe that this complaint involves many statutes in the law where Boston University violated my civil rights. I find it imperative to show a MOTIVE behind Boston University's attempt at destroying my reputation. This case is clearly very simple. It involves police cover-ups and false police reports submitted by a select small number of policemen with the backing of Chief Shea, Anne Verge and Dr. John Silber. If this Honorable Court were to engage in interviewing a long list of present and former police officer I could provide, they would confirm my complaint. No one has investigated the Trustees of Boston University in matters I addressed in my complaint. In reality, no one believes this could ever happen in a police department. I am in this Honorable Court to say that it did. The Trustees have insulated themselves behind power and money. That is what this complaint boils down to. No one investigates these things. They hurt people unjustly and they do not care. Even when they know they are wrong. Just like with my complaint. Boston University would spend a million to save a penny. No one tells BU how to do things. They operate in their own little world. They do not care about losing in litigation. There is no real money lost to them. It is powerful educational institution with an enormous endowment. Risk management. They are accustomed to viewing lives that way.

Chief Robert Shea knew I had information involving his son, Kevin Shea given favoritism in areas of police cover-ups, positions, and assignments. The members of the Union complained to me that they were not shown the same considerations in work-related positions and matters involving discipline. It continues within the Police Department today. Boston University Police Department officer's are sworn officer's that fall under the direction of the Department of the State Police as defined under M.G.L. Chapter 22C Section 63. Officer's are also sworn Suffolk County Deputy Sheriffs. Therefore, whenever a Boston University police officer is in fact acting under color of

law, they are utilizing their police authority by one or both of the powers granted them by the Commonwealth of Massachusetts. This is a vitally important law issue for debate in this case particularly when it involves police departments in the private and public sectors as defined under the law.

Every case brought before a Court of Law has it is own set of circumstances that prompt an action. It is out of those cases and circumstances before the Courts that case law exists. I could not locate any case law involving police charging police. Police are held to a more stringent and higher standard of conduct and in their knowledge of the law. Police are accountable for their actions they take while enforcing laws. I could not find case law that addresses those issues I needed to explorer. This case is particularly unusual in that it involves deliberate harmful pre-meditated calculations regarding criminal charges made up by a police department against a police officer. Why would a police department aggressively pursue and subsequently criminally charge another police officer that did no wrong? What is so disturbing is that it happened to me. Boston University intentionally plotted to destroy my reputation and attempted to end my employment in May of 2002. I have evidence and documentation to prove my claim. BU Deputy Chief Enrico Cappucci and BU Captain Tony Diorio will appear as my witness should this case go forward. I have attached, (exhibits 4 & 5) affidavits from them proving a trespass order never existed. This fact, when factored into equation, proves my entire complaint. Without a trespass order Boston University has NO DEFENSE. The named defendants would do this effectively through the collective bargaining agreement. It is funny, when you worked in my capacity for 15 years you really get to know how things will proceed. Being a Christian, I knew the thoughts and intentions of their hearts.

The Boston University Police Department on 12/22/1987 hired me. My family celebrated greatly that Christmas. 1987 quickly turned into 1988. I was then and still am today, greatly indebted to Boston University for having hired me. I remember thanking God during that time in my life for giving me that job. I gave thanks to then BU's police Chief Steven Devlin, Lt. Brian Clifford and Lt. John Fader for giving me the opportunity to serve again as a police officer. I committed myself back then to Boston University and decided with my wife to make a career there. During the course of my employment at Boston University, I had the opportunity to leave for other municipal police agencies. I turned down offers sent to me through the Ma. Civil service list sent to eligible police candidates for other municipal/city/town police agencies. My commitment was to Boston University for having given me the chance to serve as a policeman again. The benefits provided by Boston University were competitive with other area police departments. Having three children, Boston University's benefit plan of free tuition of the children of their employees ranked number one on my priority list. My wife and I decided that tuition for our children had to be calculated into my pay. I was extremely pleased with my job at Boston University.
During my first "probationary" year with the Boston University police department, I was always aware of my conduct, especially after what had happened to me with the MDC police. I began the job not having to attend a Ma. Police academy having already passed the Ma. Criminal Justice Training Program, receiving all the appropriate certifications needed to be a sworn police officer in the Commonwealth of Massachusetts. Boston

University police officers obtain their police authority granted by the Commonwealth of Massachusetts, Department of the State Police, formerly MGL, Chap 140. S10G, (now MGL C63, S10). And sworn in as a Deputy Sheriff in Suffolk County.

In 1987, I was a member of the Boston University Police Patrolman's Association, (BUPPA). The Union did not belong to the International Brotherhood of Police Officers as it does today. The Union dealt with contract disputes against Management, or the (Trustees of Boston University) by using a private Attorney, (M. Wise) they had contracted on a retainer. I later learned that during my first year on the job my Union, which I contributed $6.00 weekly dues, was over $10,00.00 in arrears to the attained Attorney.

My first two months required that I ride with an experienced officer. I did not have a set schedule during this training period and rode with different police officers on all three shifts. When I worked the 4-12 shift, I began hearing some patrolmen and two sergeants, (William Lyons, Greg Fall, Richard Cabral, George Shea, Sgt. Robert Molloy and a acting Sgt. Anthony Diorio) speaking poorly about two of the Department's Lieutenants. They specifically spoke about Lieutenant's John Fader and Brian Clifford. The Union's Executive Board, (above) complained to acting Sgt. Diorio about how Lieutenant Clifford and Fader were harassing them all the time. They also were firm in their assumption that Chief Devlin was what they called a "wimp" and "spineless". I could only mind my own business and keep my mouth shut. It hurt me personally that they spoke so cruelly about them because they were the ones that had hired me and given me an opportunity. Three weeks after being hired, another police officer was hired, (Michael O'Donovan). He attended a police academy for approximately 16 weeks. I began riding on my own about the same time Officer O'Donovan was halfway through the police academy. I worked the midnight shift. Lieutenant Fader was my Superior Officer on two of my nights and Sgt. Edward Conley my other two nights as I was on a four and two work schedule per the collective bargaining agreement. One night, in the early morning hours, I stopped a motor vehicle with a black man operator. I stopped the vehicle for a threshold inquiry as it closely matched a wanted vehicle in a earlier incident. Lt. John Fader arrived to back me up and assist. It was determined that the operator and vehicle was not involved in the earlier incident. However, during the threshold inquiry, a warrant check on the operator was conducted. Computer records showed that the operator had a straight warrant for a minor traffic violation. Legally, he could have been arrested for the straight warrant. Lt. Fader and I discussed together the fact that warrant was not a default warrant, and the operator was cooperative and answered all of our questions. The purpose of the stop was to prove or disprove the identity regarding the earlier incident. We obtained positive identification and a valid explanation as to why he was in the area at that time of the morning. The black male operator also told us that he had paid the fine and that there was an error. Lt Fader informed the black male operator that if he did not appear in court in the morning to take care of it, he would personally notify the Boston Police, the Department having jurisdiction over the warrant and his home address. We the released the operator from the threshold inquiry. Lt. Fader then discussed with me the Department policy on motor vehicle stops. Boston University Police, a privately owned educational institution, do not have the authority to issue traffic citations to motorists, therefore can not effect motor vehicles stops as per Departmental guidelines, (unless it involves the threat of serious bodily injury, etc.) He pointed out to me that my motor

vehicle stop fell within Department policies and guidelines. I did not stop the vehicle for a having committed a traffic offense.

Within months of this incident, while on duty, I requested the assistance from my shift commander, Lt. Fader. I received a radio call from BUPD Dispatch to respond to Rich Hall, a dormitory that houses BU student regarding a drunken female student. On arrival, my investigation concluded the following: The drunk female student was under the age of 21, (Ma. Legal age pertaining to alcohol laws.) Although obviously under the influence of alcohol, she answered all questions without hesitation and accurately. She shared a room with another female student who was not under the influence of alcohol. B.U.'s Office of residence life personnel were on scene. Those personnel employee's were over the age of 21 and were responsible for the care of the student's. The impaired female student, (of complied consent age, over 17) refused medical assistance from ambulance personnel who were also on scene. I advised Lt. Fader of the situation and we discussed the Commonwealth's protective custody laws. Lt. Fader suggested that I issue a B.U. student code violation against the female student for alcohol violations. Lt. Fader also suggested that I be assured that the Officer of Residence Life monitor the student's progress during the night along with the student she shared a room with. I then submitted a signed departmental incident report regarding the incident. Lt. Fader then viewed my report and also signed it. (FYI, All Departmental incident reports generated by patrolmen are submitted to shift supervisors for review and signed by their respective supervisor.) Having worked only a few months under the supervision of Lt. Fader, he demonstrated to me his knowledge of the law and his compassion for people.

Towards the end of my first year on the job, the University hired approx. 10 new police officers. Three of those officers, (Kevin Shea, Robert Casey and Richard Camillo) played a significant role in the years that followed. Their reporting of false police reports to Management at B.U., violated Union by-laws and Federal Union-Management relation laws, and laws governing Federal rights in the workplace, (particularly racial and religious freedoms). Those false reports directly effected the employment status of over a dozen former police employees who were discharged by University officials, including myself.

The Unions Executive Board during this time, (Pres. William (Buddy) Lyons, Gregory Fall, Tony Devlin, Richard Cabral and George Shea) began visiting 147 Bay State Rd., the Office B.U. President John Silber. I became aware of their visits by complaining BU patrolmen about what was going on in there. Some Officers were concerned about possible inappropriate secret dealings going on that involved Union issues. The Executive Board never informed the membership of their visits at BU President Silber's Office and verbally told those that did inquire "that they were just straightening out some unresolved contract issues". On at least three occasions, Officer O'Donovan and I saw marked BU police cruisers parked in front of the Presidents Office after 5PM, when the Office is closed. During our time of field training, when we had to ride with another officer, I personally rode with the Union President, Buddy Lyons, and Tony Devlin. Buddy Lyons, Greg Fall and Tony Devlin inquired of me about the two incidents (above) I had with Lt. Fader. They told me that Lt. Fader was giving the Union some trouble and that he was not to be trusted. They prevailed upon me about the two incidents with Lt. Fader on at least three occasions. They reported to Anne Verge, information from me that Lt. Fader acted negligently. I had great difficulties in dealing with their questioning of me about Lt.

Fader. I told them that he acted properly in my opinion. They told me that he did not act properly and that Lt. Fader just cut someone loose who had a warrant. One evening, working the 4-12 PM shift, I was assigned to ride with Buddy Lyons. Buddy informed me that he had a very important matter he had to discuss with a woman that worked as a secretary in the President's John Silber Office. He only told me that her name was Ann. Buddy, did not tell me exactly what it was in regards to, only that he had to take care of some business. Buddy told me that this woman, (Ann) was very powerful and had a direct connection to President John Silber. Buddy told me that patrolman Greg Fall also had a sister by the name of Christine, that worked with John Silber too. Buddy told me that being a new guy, I did not have a clue as to whats going on in the police department and that I was going to find out soon. He told me that things were going to start heading in the right direction. Buddy offered me advise that I should just shut my mouth and cover my own ass because there are a couple of supervisors in the Department that would "bury you" and "sell their own mother." Buddy told me I could talk with any one that has been on the job awhile and find things out for myself. Buddy told me a lot of stories about his years of being on the job. During the shift, he had me drop him off at 147 Bay State Rd. Buddy told me that he would be only about an hour and told me to grab something to eat and come back to pick him up. When I dropped him off there was a marked BU police car parked out front of 147 Bay State Rd. with patrolman Tony Devlin and Gregory Fall inside. The three then entered the front door of 147 Bay State Rd. After their meeting, we met in a parking lot known as the Deerfield lot located in Kenmore Square. Their conversation was direct and it became obvious to me that President Silber was supporting a "big move" that would involve some house cleaning and change the police department. During that same week, Sgt. Tony Diorio and the Executive Board had supper together while on duty. I was assigned to ride with Tony Devlin. After their supper break, Tony Devlin had me drop him off at 147 Bay State Rd. I waited outside in the marked police cruiser a short time until he returned.

During this same period of our first year employment, Officer Michael O'Donovan informed me that he also provided transportation of those same Officers to 147 Bay State Road. He also heard the same talk of trouble the Union had with two superior officers. Officer O'Donovan told me that he had to sit and wait in the cruiser for about an hour during one visit. Both of us discussed this issue with one another. Being on probation and new guys, we decided to mind our own business. After all, we did not even know any one to speak to about it.

On night in 1988, I reported to work for my midnight shift. I remember Officer Richard Camillo being present and scheduled to work that shift as well. At the Departments Roll Call, Lt. Fader informed us that he had received information that a secretary by the name of Anne Verge from President Silbers office was talking with certain patrolmen in the Union. He told us that their complaints involved him. He told us to be very careful about what we say and whom we speak to. Lt. Fader told us that there were some Union rats around the Department running over to Dr. Silber's office instead of his office. He told us that he knew who they were and did not see one at Roll Call. He referred to them as a bunch of little crybabies.

Not long after that Roll Call, I reported for duty on the midnight shift. There was a new female BU police officer in full uniform.. I learned her name was Anne Verge. Officer Anne Verge quickly became Captain Anne Verge.

Lt. Brian Clifford and Lt. John Fader careers ended. Boston University discharged them. Buddy Lyons became a Detective at BUPD. Gregory Fall left BUPD for the Boston Fire Department, Tony Devlin replaced Buddy Lyons as Union President. Vacancies were posted open for Union Executive Board positions.

The majority of the police department was shocked and stunned over what had transpired. The Chief of police, Steven Devlin remained with BUPD.

Several patrolmen approached me and asked if I would be interested in the open position of Chief Shop Steward for the Union. I was flattered but refused their offers because of my inexperience and my lack of knowledge with Union matters. Officers with many years on the job, (two still employed at BU) tried to persuade me into taking the position. They told me that they needed some one in the Union that had no connections with Management. They knew I had no ties to Management. I noticed on applying for the open Union positions posted.

I became Chief Shop Steward, (Uncontested). Within a few months, Officer Tony Devlin gave up his position, as Union President. Anne Verge then appointed him to Detective. I was asked by the Union membership to assume the position as Union President. I assumed that position, (uncontested). There were many remarks from patrolmen within the Department about how Union Presidents either get promoted or get fired. That either you play ball with them or you are out a job. I laughed with them.

Many of the patrolmen made comments to me about Anne Verge not being trained under the Massachusetts Criminal Justice Training Council standards. They asked me to find out if Captain Anne Verge was properly trained and certified under Massachusetts Laws. They told me that in order to be a police officer in Massachusetts she needed certification under the set of standards set forth by the Ma. Training Council and needed to attend a Massachusetts police academy. They told me Captain Verge once worked as a campus security officer at the University of New Hampshire. I told the members that Captain Anne Verge was not a member of our Union and that I would not make that a issue of Union concern. In a short time, other issues of concern where brought to me by some patrolmen. Most expressed fear and intimidation problems and conflict of interest matters under the patrol operations Captain Anne Verge.

In May of 1988, BU Sgt. Edward Conway and I became involved in a motor vehicle pursuit initiated by the Boston Police. The chase ended on Borland Street in Brookline. The case evidentially went to the Superior Court. It was the first time, court injunctions were placed upon police officers. The intent of the injunction was to prohibit the 13 Boston officers from using excessive force in the future. The Plaintiff sued the City of Boston and prevailed. My testimony in that case contradicted all of the Boston officer's testimony. A State Trooper who was also on the scene confirmed my observations. Captain Anne Verge arranged for Dr. Silber's personal attorney, (Pompeo law firm, Boston) to represent me during that trial. This incident effected my working relationship with the police in that area of my employment. Like any other job, rumors on the street in regards to Boston and Brookline police was that I was a rat and could not be trust because of my testimony in that case. Although I was not disciplined by Boston University, I was told by Captain Anne Verge University officials were not pleased with my involvement. 1989, I was on duty in a marked police vehicle riding with a newly hired police officer. We observed a vehicle being operated in an erratic manner through Kenmore Square. We

effected a motor vehicle stop for public safety concerns. The operator failed to produce identification upon our request. The operator immediately questioned our authority to effect a motor vehicle stop. He called us security guards among other things. He demanded that I notify the Boston Police and have them come to our location. I detected an odor of alcohol from his breath/person. I informed him of the reason for the stop. I then told him that if he did not produce identification to me, I would place him under arrest. He laughed and dared me to lock him up. I notified BUPD dispatch and requested my supervisor respond. The operator seemed upset and angry with us. He told me that my supervisor was also a security guard and demanded that the real police respond. Prior to Captain Anne Verge and Sgt. Kevin Bourque arriving, I learned that the operator was Ned Merick, a Brookline Police Lt.., and a Executive Board member of the Massachusetts Police Association. Captain Verge and Sgt. Bourque ordered me to clear and subsequently released Mr. Merick. I was later ordered not to provide a police report over the incident.

In early 1990, Boston University Police hired a former Captain of the Boston Police Department by the name of John Ciccolo. He was hired at the rank of Captain and had obtained a 6-year contract from the University prior to accepting his employment. Boston University did this hiring of Captain Ciccolo amidst controversy over BU police officers stopping motorists and jurisdictional issues. Captain Anne Verge was issuing and allowing BU police officers to effect motor vehicle stops on the pretext of using the Commonwealths defective equipment citations, (DE tags). Boston University received complaints from the public over a issue of law regarding the private sector security departments authority in stopping motor vehicles and issuance of the defective equipment tags. In one incident, I recall Boston University officer Patrick Nuzzi stopping a motor vehicle for having a cracked taillight. Officer Nuzzi effected the stop and subsequently arrested the operator for a straight warrant for a minor M/V offense. The operator was taken into custody and the vehicle released to his wife and infant child who were passengers in the vehicle at the time of the stop. The warrant information was obtained resulting from the M/V stop. My Executive Board requested that Boston University deal with these issues of law as it pertain to our authority in this area. Captain Ciccolo was instrumental in clearing the issue up immediately. He subsequently collected the DE tags informing all BUPD officers the Department did not have that authority. Anne Verge was not pleased. She wanted very much for BUPD officers to have that authority to stop motorists for traffic offenses. Our Executive Board eventually worked alongside BUPD Management in an effort to submit a Bill to the House of Representatives that would allow BUPD officers authority to issue Ma. Uniform traffic citations, (Ch. 90 powers). The efforts failed and the House Bill submitted was fought and defeated.

Prior to Captain John Ciccolo being hired, Captain Anne Verge was instrumental and convinced the Trustees of Boston University in creating a new position within the police department of Deputy Chief. She created and assumed that position when BU hired Captain Ciccolo. Deputy Verge could now maintain control of the police department. This position would allow her to have a higher rank than that of Captain, thus allowing her the position and authority over decisions made at BUPD. Why would a small Department need this position? Every officer in that department at that time knew Anne

Verge for Anne Verge created the position. It had direct backing of President John Silber. Anne Verge could now report directly to John Silber all issues that may arise within the police department. She demonstrated to all she had a lot of pull and power and could do just what she wanted. The Union members were complaining to me already over Anne Verge showing favoritism towards certain officers she liked, (mainly Kevin Shea, Robert Casey and Richard Camillo). The three were often seen drinking and socializing together at T's Pub, a local bar just up the street from the police station. They also all went on a cruise ship together. Anne Verge had gone from a secretary at President Silber's office to Deputy Chief of the police department in under a year. This position given to her was accomplished without examinations and proper training in the laws of the Commonwealth. The moral within the department was not good. Only a few prospered.

In Dec. of 1989, I presided over a Union meeting where the membership voted by majority to send a letter to Governor Michael Dukakis. The States proposed merger of the State Police, Metropolitan Police, Capital Police and Registry of Motor Vehicles Police Departments into one entity was not received favorably because of unanswered questions those particular Unions had. Some of our Union members were approached and asked that our Union stand alongside them in opposition of the merger until their Union concerns/questions with contract issues were answered. The letter was prepared on BUPPA Union letterhead stationary. It was signed by me dated 1/20/1990. Prior to sending it in the mail, I made a copy of the letter for our Union records. I forgot to take the original copy from under the cover of the copy machine. Deputy Chief Anne Verge found the original letter on the copy machine and returned it to me. She told me she read the letter. She did not indicate to me any problems with it

On Jan. 31, 1990, Union Shop Steward Jack Struble and Union Secretary Mary Wallace and myself were sent up to the New Hampshire Training academy on a two day training seminar on hand cuffing. Neither of us requested this training. This type of training was not part of the annual In-Service training required by the Massachusetts Criminal Justice Training program. Never before where officers sent to training involuntarily. Deputy Chief Anne Verge previously attended a campus security academy at that same facility before working with the security force at the University of New Hampshire which is located in the town of Durham, New Hampshire. Before we departed for the seminar, Deputy Chief Anne Verge told us to say hello to her old friends at the academy.
On Feb. 1, 1990, the last day of the two day hand cuffing seminar, Officers Struble, Wallace and myself were inside a Gymnasium finishing up with paperwork which was given to us by the training instructors at the academy. While completing this paperwork, I was approached by a instructor, Captain Smith-Pearson who had asked to speak with me outside the Gym. I complied. When we exited the Gym, he accused me of cheating on the examination. I thought he was joking. Looking at his facial expressions, I could tell he was not joking. I denied his claim outright to him and told him if he thought I was cheating, I would take the test privately. He then allowed me to go back into the gym. We completed and submitted our paperwork and left the training facility to return to BU.
On Feb. 1, 1990, after returning home from the New Hampshire Training Facility, I called BUPD at 9:15 PM and reported to Sgt. Steven Giacoppo that I was sick and would not be in for the midnight shift. I became ill and could not believe that Captain Smith-

Pearson accused me of cheating. Being a police officer, I was deeply troubled by his accusations. Captain Anne Verge knew Captain Smith-Pearson personally while employed at UNH. Although I can not prove it, I believe Boston University wanted to end my employment and Captain Anne Verge and Captain Smith-Pearson orchestrated having me accused of cheating. How can a police officer be trusted if he is a cheater? The mere accusation alone is damaging to a police officers reputation. Captain Anne Verge personally knew a police officer that worked on the Durham police department. UNH is located in the Town of Durham. The police officers name is Jack St. Hiliare. BUPD would later hire Jack St. Hiliare as sergeant. They would employ his services to write me up. His charges against me ended my career at BU. Sergeant St. Hilliare filed a false police report stating that I was late for my shift. In truth, the complaint I filed revolves around his actions and reporting lies. He reported that I was insubordinate towards him. He lied. I provided a witness to prove what he reported was false. BUPD did not investigate the incident as I indicated in my complaint on page 5, paragraph 4. The suspension letter was removed my personnel file. I indicated that in my complaint on page 3, paragraph 3. All written reports regarding the entire incident I have in my possession. Given the opportunity, this documentation and my witnesses I can provide can beyond a reasonable doubt, prove my complaints in its entirety. They deprived me the opportunity and right to face my accusers. Management intentionally disregarded my information I provided them. Another officer, Paul Jackson and I came in at the same time. Paul and I became stuck in traffic behind a six-car accident on the expressway. Sergeant St. Hiliare did not ask Paul Jackson to complete a written (To-From) report, as done with me. That is precisely my point in demonstrating how police management singled me out. My documentation is littered with instances were BU Management arbitrarily and discriminatory singled me out for discipline and work related assignments. In reality, Boston University harassed me during my 15 years on the department. Police Management took advantage of my being Christian and not reporting incidents as they happened to me. Just like this case. I proclaimed my innocence that is all I had done. Their action forced me to defend my family and myself. God tests those He loves. God put those in authority over me in their positions. Who am I to disrupt His will.


On Feb. 6, 1990, I was a target of an internal affairs investigation and reported AWOL from the midnight shift I reported to Sgt. Giacoppo. I began the grievance procedure and I was evidentially cleared of the charge of AWOL and correctly charged a sick day. I spoke with Sgt. Giacoppo after the Departments internal affair investigation had concluded. He informed me that he was not asked by any one in the police department of my reporting to him that I would be out sick on 2/2/190. This incident was troublesome to me in that the internal affairs investigation was not conducted properly.

On Feb. 9, 1990, I was a target of an internal affairs investigation regarding the cheating incident while at the New Hampshire Training Facility. I filed a grievance with the Union and on 3/18/1992 an AAA Arbitrator, (AAA # 1130-1792-90) sustained my grievance. I have all documentation regarding this incident. This incident caused me great harm and embarrassment. Boston University pursued intentionally and with malice,

attempting to effecting my employment and damaging my reputation and credibility. Their intentional effort to cause me harm was clear and obvious to me.

On Feb. 14, 1990, Boston University prevailed upon me regarding the letter written on behalf of the Union we had sent to Governor Michael Dukakis. This letter, written on behalf of the Union clearly did not involve Management at the police department. I expressed to BU police Chief Steven Devlin and Deputy Chief Anne Verge that the Union had a right to express concerns regarding the proposed merger of the police departments and it was not a matter that involved Management. This letter I signed and dated cost me dearly. They requested I report to Boston University's Office of the General Counsel for investigation. The Office of Personnel and Labor relations where advised to act from Chief Devlin and Deputy Chief Anne Verge. Chief Devlin noted that in his letter to the Commissioner of Public Safety, William McCabe dated 2/14/1990. On or about 2/17/1990, I reported to the Office of the General Counsel, there were several members representing different departments within the University. I knew only one of them, BU Attorney Michael Rosen. We discussed the letter I had written and I was told what action the University would like me to take to remedy a fall out the University expected might happen. It was clear to me that the University was very concerned over Dr. Silber's bid to run for Governor of the State of Massachusetts. I was told that the University did not need this publicity and attention during this time. The University clearly expressed their dissatisfaction over the timing of that letter to me. I informed them that it was not the intention of the Union to express or imply that the University was behind or supported the Unions letter. Out of fear of future retaliation against me, I agreed to take their advice. They suggested that I write a letter of retraction to Governor Dukakis and Commissioner McCabe. I agreed to discuss it over with the Union and get back with them.

On 3/13/1990, I received a telephone call at my home by the Unions Chief Shop Steward, Michael Dello-Russo, informing me that the Chief imposed a 3 day suspension on me regarding the cheating incident in New Hampshire. On that same day, I received a letter from Patrolman William Campanella demanding an emergency Union meeting over an incident where Detective Buddy Lyons received a speeding ticket from a State Trooper. Prior to Buddy Lyons being handed the speeding ticket, the Trooper told him that he was getting the ticket because of the Union letter he had read in the State Police Association of Massachusetts "Trooper" magazine. I confirmed that it had. My letter to Governor Dukaskis was printed in the March 1990 Trooper magazine. On 3/19/1990, I met with Dr. John Barry of the Ma. State Police stress unit. I was under tremendous pressure from every direction I turned. We talked things over and I found him sensitive to all the issues I was faced with. He told me a retraction letter sounded like a good idea. After our meeting, I held an emergency Union meeting. I advised the Union of my meeting with the Office of the General Counsel and the situation with the Ma. State Police. The Union voted to send a letter of retraction. That retraction letter was printed in the June 1990 Trooper magazine. Ironically, before my sending the retraction letter, I was stopped one night on my way into work. I had a headlight out and the Trooper asked for my license and registration. When I handed him my license, he laughed. He said, " Richard White, are you a police officer at Boston University? I answered yes. He asked to see my police

Id card which I show him. He shock my hand and thanked me for supporting the opposition to the merger. He told me it was a good letter. He told me to be careful because some of the barracks had a "bounty" offering $300.00 to any Trooper that issues me a citation. He laughed, telling me he did not need the money and wished me well. He did not issue me a citation for my defective headlight. I remember that night so well. I thought of what a great democracy we have and the freedoms this Country enjoys. How people are so different in the way, they view things.

It does not take a rocket scientist to know when you are not wanted by your Employer and a when a person is not pleased with you. It was obvious to me that Deputy Chief Anne Verge did not care for me. Nor did her BU comrade friends, Sgt. Tony Diorio, Sgt. Molloy and patrol officers Kevin Shea, Robert Casey and Richard Camillo. These officers were given special privileges and where constant instigators in disruptive conduct both on and off the job. Detectives Buddy Lyons and Tony Devlin received the same type favoritism's and enjoy years of doing what they wished to do without the threat of having to answer to a supervisor. Deputy Chief Anne Verge would always rescue them from threats of accountabilities, regardless of their conduct. The witnesses I mentioned in the beginning of this letter of explanation will testify to their outlandish unprofessional conduct they often displayed. The move orchestrated by Dr. Silber by sending his secretary Anne Verge into the position of a police officer, and Lieutenants Clifford and Fader packing their bags, clearly showed the police department who was in charge. Their message was very clear. Ride this bus or get off. That act never would have happened in a real police department that falls under the Massachusetts Civil Service Act. Nevertheless, in the private sector, where John Silber is in charge, everyone understands it is his way or the highway. Hail Doctor. The moral at the police department is to this day the very same. That is because they are still in charge. Even the BU attorney's and the Trustees know this to be true. They all fear for there plush jobs. They are not free. They are people with no backbone. Yes-men. Afraid to speak the truth not wishing be a known as a conformist under Dr. Silber's dictatorship. He runs the place like Nazi Germany. Much like Hitler, but instead of killing those that oppose him, he threatens their jobs. Like with me. Oh, how they hide hoping no one takes my complaint seriously. That is why they attempted to discredit my reputation. The Trustees of Boston University's deliberate actions were malicious and reckless in their pursuit in damaging my profession.

In Attorney Lucey's Motion to Dismiss, on page 2, 2nd paragraph, the last sentence reads "Plaintiff contends that the letter led University officials to request him to submit to a psychological/fitness for duty examination, which defamed him". That is entirely true. However, the Trustees of Boston University were not to exercise their rights in an arbitrarily manner as noted in the collective bargaining agreement. In my grievance filed with the Union, I noted that violation of the contract. Boston University never before sent a police officer solely for obtaining a psychological evaluation on a officer in the fifteen years I was employed there. The only way Boston University could defend themselves against my claims made in the letter I sent to the Trustees, dated 4/25/2002, (exhibit 6) was to demonstrate I was not fit to serve as a police officer. They had to show I was crazy, nuts. They used certain officers that received favoritism to accomplish their task.

Chief Shea's (Godson) Sergeant Daniel Healey, Sgt. Lawrence Cuzzi, Officer's Rochville, Abdallah, McCarron and Donnalan would provide their ammunition they needed. They all reported to police management that I was putting them in fear. They referred to me as a terrorist. They were reporting that I was like the people involved in the terrorist attacks on the World Trade Center. They reported I was telling everyone they were going to hell. I could write a book regarding those officers I just mentioned. Before those officers were hired, Chief Shea asked them to vote for his son Kevin, who was running against me as Union President. I know of this because I can provide this Honorable Court with witnesses. Those witnesses told me that during the interview process, Chief Shea told them that his son Kevin was running for Union President. He asked them if he could count of their support casting a vote for son for Union President. They told the Chief, yes. Boston University deployed unethical tactics in an effort for the Chief to take the Union over. During my order by Boston University Police for my psychological examination, I never denied their right at ordering me to take the examination. I did attend the scheduled meeting as ordered that Boston University had arranged with Dr. Scott. I asked Dr. Scott if Boston University had contracted her to evaluate me. She told me that they had. I asked Dr. Scott whether our meeting was private and protected under the (Dr. & Patient) confidentiality laws. She told me it was not. I asked Dr. Scott to provide me with information as to who was going to obtain the results of her evaluation of me. She told me she did not know. I informed Dr. Scott that I was a member of the patrolmen's union and that her results given to Boston University officials be forwarded to my representative with my Local and the International Brotherhood of Police Officers. She told me she only had the authorization to provide Boston University officials with her results. I asked Dr. Scott if we could re-schedule a meeting so I could confer those matters with the Union. We booked a future date for a exam together. I notified the Union about the meeting and discussed those matters of concern. The Union representative informed me that Boston University was in violation of the collective bargaining under Art. 26 and past practices that had been established. The Union forwarded a Demand to Bargain over the matter outlining a series of questions as to who would receive the results of Dr. Scotts examination. Boston University did not contact the Local or IBPO after receiving the Unions Demand to Bargain request.

I have worked for three police department in the Commonwealth and have separately taken each department examinations and interviews with their respective department's psychologist. I was found fit for service as a police officer in each instance. Upon being charged criminally on three counts of trespass, the Plymouth Police Department ordered me to submit to another psychological review. The Plymouth Police Department placed on me administrative leave pending the results of the psychological examination. I was ordered to surrender all firearms in my possession to the Plymouth Police Department. I complied with their order. Approximately three weeks later, Plymouth Police Captain Botieri advised me that the results of the examination concluded me fit of service. He ordered my return to duty. Captain Botieri told me that he personally spoke with the psychologist and he reported that I was one of the sanest police officers he ever met. I have taken and passed four independent psychological examinations administered by State certified psychologists. I had to endure facing criminal charges on three counts of trespass and placed on administrative leave pending the outcome of a psychological

examination. The deliberate willful, malicious, wanton, reckless actions of the Trustees of Boston University caused tremendous emotional duress on my family and me. The Trustees of Boston University attempted to take way my means of providing for my family.

In my position as Union President, I questioned and challenged Management regarding new policy changes or Departmental General Orders when they violated the collective bargaining agreement. I represented all bargaining unit members in the Union. I fought and defended aggressively violations of the collective bargaining agreement and was equally aggressive during contract negotiations. Those contacted to Anne Verge did not intimidate me and received unmerited, special favoritism.

Dr. Silber and Deputy Chief Anne Verge has a relationship that goes back to Dr. Silber's days in Texas. Dr. Silber was very close to the Verge family. Dr. Silber is fully aware of Anne's troubled divorce that landed her in a psychological ward for a brief stint.

Being Union President, I was made known of many events that were swept under the rug. I was a loyal employee and always kept my mouth shut as long as it did not involve a violation of the contract or a Union member's job. I found that my position as Union President, I was always under scrutiny and having to defend myself in disciplinary matters for incident where I had done nothing wrong. In all my disciplinary charges the University placed against me they discovered that I had done no wrong and at all times acted properly. The University always attempted to build a paper trail against me in their effort to end my employment. This became more prevalent after the University hired former Belmont police Chief Robert Shea. I have in my possession all of my past disciplinary actions the University took against me.

In 1991, Deputy Chief Anne Verge backed and assisted in the promotions of Detective Buddy Lyons to the rank of Detective Sergeant, (originally posted of patrol sergeant) and Sgt. Tony Diorio to the rank Lieutenant.

During my tenure as Union President, on or about 1991, our Executive Board managed to join the International Brotherhood of Police Officers, (IBPO) Local #347. Shortly thereafter, I was denied a grade advancement to the rank of Police Officer IV. It was the first time in the history of the BUPD that a patrolman was denied grade advancement. This was retaliatory in nature. I filed a grievance with the IBPO regarding this and eventually won consideration for another review board. My grade advancement passed after review a second time. I later learned that Deputy Chief Anne Verge ordered Detective Sergeant Buddy Lyons and Lieutenant Tony Diorio to intentionally deny my grade advancement. Before the death of Buddy Lyons, he told me that Anne ordered him to deny me my grade advancement. I asked former Captain Tony Diorio at my trial in Brookline Court in Feb. of 2004 if Anne Verge ask him to intentional fail me at my grade advancement. Before Sergeant Buddy died, he admitted to me that Anne Verge told him to fail me. Tony Diorio told me he too was told by Anne Verge to intentionally deny my grade advancement.

On or about late 1991, Deputy Chief Anne Verge was going to assume a position with the University as Vice President. Her acceptance would open up the Deputy Chiefs job and about 90 % of the Department hoped that BUPD's Training and Accreditation Officer, Daniel Welch would fill in that position. Mr. Welch was a former Kingston Police Chief and well respected within the Law Enforcement ranks and within the Department. Mr. Welsh was an honest and fair man. Mr. Welsh was not a yes-man.
I remember the majority of the police department began in singing a song, "ding. dong the witch is dead" when news came she was leaving. I loved that song because it seemed so fitting. I will admit, I also sang, (around the right people of course).

Deputy Chief Anne Verge assumed a Vice Presidents job with the University. The position of Deputy Chief was now vacant. Chief Steven Devlin temporary promoted Daniel Welch to the open position of Deputy Chief. The Police Department's moral sky-rocketed! I am telling the truth when I say I literally saw grown men dancing in the street. Police Officers were giving the high -five, shaking hands and smiles were seen on faces that once drooped. That is no exaggeration. Kevin Shea, Robert Casey, Richard Camillo, Tony Devlin, Buddy Lyons, Tony Diorio and Robert Molloy must of reported the unusual behavior of policemen to their beloved Anne Verge. Daniel Welsh enjoyed his promotion for about 48 hours. Chief Devlin retracted his notice to all Department personnel. The position would remain unfilled until a nation wide search was conducted to fill Anne Verge's position. The position of Vice President Anne Verge had assumed kept her in control of police operations. The Chief of Police would have to report to her office.

During this time at BU, rumor had it that Belmont Police Chief Robert Shea was retiring and was being considered for the position. Everyone on the job knew that Chief Shea and Anne Verge were dating. Chief Shea was going through a divorce and the two began dating. Tony Diorio and Kevin Shea introduced Chief Shea to Anne Verge at an Italian American Police Officers Dinner event that year.
When the rumors began to be truthful, the Union membership demanded the Union attempt to convince some at BU it would not be in the interest of the University to hire him in the particular position. Union members were very concerned of conflict of interest matters. It was obvious that the two were dating. Having Anne Verge a VP, at BU who oversees the operations of the police department and her boyfriend Chief Shea appointed Deputy Chief of the BU police would certainly be deemed a slight conflict of interest. Most all the Union members' complaints surrounded around patrolman Kevin Shea and Chief Robert Shea were father and son. Kevin Shea, Union member, was shown favoritism in assignments and certain promotions within the Department from Anne Verge.
The reports I had heard from the International Brotherhood of Police Officers concerning Chief Sheas record while in Belmont were not favorable. Chief Robert Shea was well known to him because they represented a group of policemen in that Department. They told me they had handled a more than average amount of grievances from a Town that size. It was inferred that he was not an approachable and reasonable type of Police Chief they typically deal with in grievances. I heard of their stories they said they remembered about how Chief Shea's son Kevin, used to take the money out of the parking meters at

the police station and how he would always have a brand new bicycle. Belmont officers reported those things to IBPO representatives during grievance hearings. They also said, if the nut likes you, He would do any thing for you, even rob a bank, and they laughed.

Chief Shop Steward Peter Hoerr and myself were asked by the majority of officers to speak with someone at the Department of Personnel over conflict of interest concerns regarding Anne Verge and Chief Shea. We arranged to speak with VP Richard Towle and VP Joseph Mecurio. Officer Hoerr and myself spoke with them both and relayed the memberships concerns over possible conflict of interest matters. We personally gave the Union's vote of confidence in Daniel Welch who had temporarily been appointed and suddenly removed. VP Joseph Mecurio told us that he currently had a brother that worked for the University. He said that he would rather hire a relative than someone he does not know because he knows he could trust a relative. We thanked both men for having met with us.

Former Belmont Police Chief Robert Shea was appointed Deputy Police Chief of BUPD.

I recall twice seeing Police Chief Robert Shea, leaving from the rear door of VP Anne Verge's apartment. Both occurrences happened in the early morning hours while I was on duty and on patrol. The first time I saw him, coming out of her apartment I was deactivating alarm systems. I happened by him and He waved at me signaling me to come over to him. I pulled alongside the curbside and turned down the passenger side window. He bent over holding both hands on the door has he looked him on me. He said, " Officer White, do you know I have a gun on me and I could shot you right now?" That comment shocked me. I remember I didn't take him seriously and immediately I said back to him, " You may shoot me, but I'll shoot you too." He picked up a picture off the sidewalk/street where he was standing. He looked at it and flung the picture at me. He said, "if you can find that guy I'll give you three weeks vacation." He then walked away. I saw him again leaving Anne's Bay State Rd. apartment and pretended I did not see him.

1992 to 1996 I was involved in six disciplinary investigations. During this same time period, Kevin Shea and Robert Casey were involved in incidents that warranted their arrests. Because Deputy Chief Shea dates VP Anne Verge who personally knows President Silber, these incidents resulted in no discipline to those officers. I will mention only those incidents where I can provide a witness. Kevin Shea and Robert Casey where always together. They worked the same shift and were on the same squad together. They always rode together, vacationed together, played in the same band together, and socialized together. They were known at BUPD as fric and frac, big Kev and little Kev. Raring would they act alone or were seen alone.
Deputy Chief Anne Shea selected them as field training officers and firearms instructors over senior officers that had requested the same positions. The Union grievances that were filed over their assignments were denied. The Management rights clause in the contract enabled them to do pretty much what they wanted when they wanted in regards to promotions transfers and temporary assignments. Sergeant Larry Manning had his personal police scanner on top of his desk at work. Kevin and Bobby intentionally broke the scanner. Sgt. Manning reported the incident and requested the Department investigate

who had broken his scanner. Several officers reported who was responsible. Nothing happened. One night, Transportation specialist Roger Gagnon was sitting at a desk in the sergeant's room eating supper. Kevin and Bobby entered in and approached Roger while he eat. Bobby removed a mace canister from his pocket and gave a long blasted of the propellant directly to his face and food while he was eating. Roger Gagnon reported the incident. Nothing happened. Roger Gagnon reported that he found four tires slashed to the University owned vehicle he had. Nothing done. Roger Gagnon reported that he found the rear window to the sergeants marked police cruiser had been smashed from Bobby shooting a pellet gun out of the third floor window of the police station. Nothing done. On several occasions, Roger Gagnon and other officers discovered that Chemical Mace was sprayed on the radiator of University police vehicles. This caused great discomfort to everyone using those cruisers but Kevin and Bobby Casey. Nothing done. One cold winters night, Roger Gagnon found a University owned vehicles tires, windows and doors were frozen solid due to a liquid substance spilled all over it. Nothing done. One night, in the locker room on the third floor, Kevin handed Michael Dello-Russo a loaded firearm and told him it was unloaded. Michael discharged a round that went through the wall out into the parking lot in front of the police station. Kevin took a weight bar used in lifting weights and plunged it through the bullet hole. Nothing done.
Kevin, Bobby and Officer Paul Jackson were on duty and returning to the station after completing a assignment. They became involved in a motor vehicle pursuit in an unmarked police cruiser in violation of Department rules and regulations. During the pursuit, the pursued vehicle drove on a crowded sidewalk at 700 Commonwealth Av., injuring three BU students. Kevin Shea was operating the unmarked police cruiser. Nothing done.
Kevin Shea and Bobby Casey went to Lucky Johnny's, a liquor establishment in Brookline. They were armed, off duty and in civilian attire. When they arrived, they found that there was a line of people out front waiting to get in. They cut in line and approached the doorman. They opened their jackets and displayed their handgun they had holstered to the doorman. The doorman stopped them and told them they could not come inside on this particular night because it was already over crowded inside. Kevin and Booby ignored the doorman and went inside anyway. When Kevin and Bobby arrived at the bar to order their drinks, the owner of the establishment immediately confronted them and asked them to leave. An argument began with the owner and others officers that are not employed at BU. Kevin and Bobby where escorted out of the bar. A few minutes later, gunshots were heard in the rear parking lot. A speeding vehicle taillight was seen has it turned the corner exiting the parking lot. The doorman's car sustained several bullet holes. Everything done.
Bobby Casey disobeyed a direct order given to him by a superior officer. Bobby immediately telephoned Anne Verge at her home and complained he did not want to be forced to work. Anne Verge ordered the superior officer to order someone else.
Bobby Casey intentionally disobeyed an order given to him by Sergeant Bubby Lyons and Lt. Steve Giacoppo when assigned to an under cover operations at the Howard Johnson Motel, (owned by Boston University). The purpose of this under cover operation was to provide surveillance on a room they suspected was being used for the sale of drugs. Bobby Casey was one officer that kicked in the door to a room and held the Asian male occupant at gunpoint. They quickly discovered that they kicked in the wrong door.

Bobby and the other officer then entered into the correct room and illegally conducted strip searches of the male and females students in the dorm rooms bathroom. Bobby and the other officer refused Union representation and would not speak to the Union Executive Board regarding the incident. Bobby and the other officer received a two-day suspension. Lt. Steve Giacoppo, not even present, became the fall guy and released from employment by the University. Chief Robert Shea, VP Anne Verge and Dr. Silber acted immediately when the incident occurred. The Office of the General Counsel employed their legal experiences and was successful in covering up this incident thus preventing media exposure and civil rights violations against the officers and Boston University. After this incident, Sergeant Buddy Lyons began to drink alcohol again. He placed a major role in assisting Anne Verge in her move into the police department and he found that he was being reported to Captain Diorio and Chief Shea about his supervisory decisions. Officers Scott Rocheville, Brian Abdallah, Peter McCarron, William Donnollan and Larry Cuzzi worked his 4-12 shift. Sergeant Lyons complained to Captain Diorio and Chief Shea regarding those officers not patrolling the BU campus. He reported incidents where those officers were getting involved in police activity outside the BU campus area. Management at the police department never addressed Sergeant Lyons concerns over those officers running amuck in the City of Boston. Chief Shea transferred Sergeant Lyons to the 12-8 shift.

Those actions and events may not be in the jurisdiction of this Honorable Court. It may fall under the jurisdiction of the Massachusetts Attorney General and the Massachusetts Department of State Police, Department of Public Safety's licensing unit.

I find that my reporting of these incident refresh my mind over incident to numerous to mention. I will stop at this point rather than provide information I know about incidents that involve those officers under Sergeant Lyons supervision. Sergeant Lyons died by himself in a hotel bathroom. The stress he endured on the job contributed towards his death. He spent the last weeks of his life at my home and Michael O'Donovan's home. Buddy told me he deeply regretted trusting Anne Verge and Christine Ming a long time ago at Dr. Silber's office. He deeply regretted accepting his promotion to Sergeant because it took him out of the Union and he found himself a employee at will. Buddy Lyons relationship at his home had fallen apart. His girlfriend had had enough of Buddy's drinking and depression over his job at BU and the relationship was troubled. Sergeant William "Buddy" Lyons is dead. If I reported the incident he told me, that information would simply be "hear say" evidence.

In my efforts to help the Trustees of Boston University, my reporting of corrupt unethical police practices was used against me in a deliberate pre meditated plot to end my employment with the University. My position as Union President frustrated Chief Robert Shea, VP Anne (Verge) Shea and Dr. John Silber. It also frustrated the favored police officers that were in the same Union I belonged to. Over my ten years as Union President, I demonstrated to them that I would not play by the rule of favoritism and promises. I always tried to do right thing and not intimidated by them. I stood for just and

right principles and was aggressive as Union President and as a police officer. My reputation and abilities as a police officer and Union President are documented and known to all the defendant and those that know me. When I became a born-again Christian I began to realize that God watches everyone. He knows the heart of everyone. He is our Father. He was Jesus Christ, (Emanuel, God with us). He is the Holy Spirit. All of us are descendants of Adam & Eve. We inherited their sinful nature. We all will face death one day. Without accepting God's salvation plan He established through Jesus Christ's shed blood on the cross you will end up in hell. All those that have heard about Jesus and freely choose not to believe will perish for all eternity. This one single truth, told by God, is what motivates the believer. The believer possesses the Holy Spirit It is the work of the Holy Spirit that drives the believer to "spread the good news". A divine transformation begins in a person's life when he believes the Bible is Word of God. If you do not believe what I just wrote grab yourself a Bible and enjoy the richest blessings God can give, eternal life. God says that we will all live for eternity. The question is where will you spend it. Living a good clean life will not do you any good. I am not responsible for the choose you make while you are here on earth. I am responsible to God if I did not tell you these things. I have done what God has predestined me to do. It troubles me that I have reported some of the events I knew took place at Boston University. If what occurred to me did not involve my family, this would not be in this Honorable Court. My daughter's education benefit I worked hard for was taken away from her because the Trustees of Boston University were negligent in not investigating my concerns. Because the people involved in attempting to end my employment were protected by the influence and relationships between Chief Robert Shea, VP Anne (Verge) Shea and Dr. John Silber.

As all the other internal investigations lodged against me by Management at the Boston University Police Department this incident is no different. It involved me doing nothing wrong but everything right. It clearly shows and demonstrates Chief Shea's deliberate willful attempt, at ending my employment with the University and his attempt at effecting my employment with the Plymouth Police Department. It demonstrates how the Trustees of Boston University supported Chief Shea's attempt at taking away my ability to provide for my family. It demonstrates that the Trustees of Boston University are equally responsible in their neglecting to investigate my claims against their own police department. It demonstrates the Trustees of Boston University participated and supported Chief Shea's efforts in my employment with the Plymouth Police Department.

I have read Attorney Gerald Lucey's Motion to Dismiss. I agree in the case laws he presented in his motion. Attorney Lucey and Boston University's Office of the General Counsel hope this Honorable Court over looks a very important element in my complaint. Motive. In all the case law Attorney Lucey refers, the defendants did not have a personal vendetta against the Plaintiffs. The Defendants acted in "good faith" while exercising their rights and performing their jobs. In my complaint differs greatly. The Defendants acted in "bad faith" and did not properly perform their jobs. The public and private sector has nothing to do with my constitution rights granted me under the Constitution of the United States of America, (42 U.S.C 1983). Nor under the Commonwealth of Massachusetts common law of malicious prosecution, slander and criminal negligence under (M.G.L. C 12(H) and 11(I).

My complaint crosses both these protected constitutional rights acts. The facts supported in the complaint clearly indicate entitlement for relief. Boston University police officers, although private sector employees, act "under color of law", granted under the M.G.L. C63, S10, powers granted to them by the Commonwealths Department of State Police/Department of Public Safety. Boston University police officers are also Deputy Sheriffs in Suffolk County and act "under of law", granted under the Sheriff of Suffolk County, M.G.L. C, Because Boston University is a private sector institution, police officers acting "under color of law" are not insulated and protected in suits filed alleging civil rights violations. The Trustees of Boston University have obtained arrest powers for their sworn police officers through the Commonwealths Department of State Police and the Commonwealths Suffolk County Sheriff Department. A reasonable conclusion is that an established long-standing relationship exists between the Trustees of

I challenge the constitutionality of the trespass order given me by Boston University when order was served upon me when the officers where at the Plymouth Police Department, (Attorney Robert Smith, author). I ask this Honorable Court to hear the evidence the Trustees of Boston University used that gave rise that supports the University's right in issuing a trespass against me. I ask that the trespass warning be removed. There clearly is insufficient evident just cause exists for the issuance of the trespass order currently place upon me. I will present a viable defense in my quest to have the order vacated. Having ill feelings or bad opinions regarding a person does not give rise to the issuance of a trespass order, which clearly is the case in this matter.

My complaint does not state in it a claim to seek damages against the Commonwealths Department of State Police or the Sheriff of Suffolk County. Although officers act "under color of law" through those powers granted them, those agencies are not responsible for the training and supervision of BUPD officers. The complaint clearly infers I seek damages that resulted by their actions as each acted in their individual or personal capacity as they acted "under color of law". Boston University police officers act "under color of law" as State and Municipal police agencies do, defined under (M.G.L.C 63 S10). One exception to that law is that they do not issue traffic citations, which is solely the role of State and Municipal police agencies. Revenue collected from traffic citations are not funneled into the private sector.

Boston University police officers effect arrests and file criminal complaints against the public at large and not just the Boston University student population. There is a reasonably established relationship between the Commonwealth Courts and the Boston University Police Department. Some Boston University police officers are certified training instructors in the Commonwealth of Massachusetts Criminal Justice Training Council and instruct in the Commonwealths training academies. Clearly, the relationship between those public and private sector institutions is established.